# In the United States Court of Federal Claims

Nos. 22-1568, 22-1569 (consolidated)
Filed: August 25, 2026

| | |
|---|---|
| CHETCO RESOURCES, LLC, *et al.*, Plaintiffs, | ) |
| v. | ) |
| THE UNITED STATES, Defendant. | ) |

*Quentin M. Rhoades*, Rhoades & Erickson, PLLC, Missoula, Montana, for plaintiffs.

*John P. Tustin*, United States Department of Justice, Washington, D.C., for defendant.

**OPINION AND ORDER**

***SMITH*, Senior Judge**

Between June and November 2017, the Chetco Bar Fire[1] burned 191,197 acres in the Rogue River-Siskiyou National Forest (the forest). Besides the national forest, the fire consumed private property, including six homes and twenty other structures. Plaintiffs are three homeowners and two timber companies that own real and personal property destroyed by the fire. They claim the United States Forest Service's ("Forest Service" or "USFS") policy of utilizing wildfires to reduce dry fuels buildup, combined with backfires set by the Forest Service, burned their properties. *See generally* Compl., No. 22-1568, ECF No. 1; Compl., No. 22-1569, ECF No. 1.[2]

Before the Court is defendant's motion for summary judgment. *See* Mot. Summ. J., ECF No. 40. Defendant contends that it is entitled to judgment based on causation, which proves fatal to all plaintiffs' claims. *Id.* at 22. Alternatively, defendant seeks to (1) establish the proper causation standard for inverse condemnation takings; (2) judgment on plaintiffs' claims that the government let fires burn their properties to meet natural resources benefit management objectives: and (3) on claims related to backfires set after August 21, 2017. *Id.*; Def.'s Reply 18–19. For the reasons stated below, defendant's motion, ECF No. 40, is **GRANTED-IN-PART and DEFERRED-IN-PART**.

---

[1] The fire started near the Chetco bar, a sandbar in the Chetco River. *See* Def.'s Ex. 4, Chetco Bar Fire Long Term Analysis & Implementation Plan 6, ECF No. 40-4.

[2] *Chetco Resources, LLC v. United States*, No. 22-1568 is the lead case, consolidated with *Worlton v. United States*, No. 22-1569.

## I. Background

### A. Initial Response to the Fire

The Rogue River-Siskiyou National Forest is a 1.8-million-acre forest in southwestern Oregon and northern California. Def.'s Ex. 2, GAO-20-424, Info. on Forest Serv. Resp., Key Concerns, and Effects of the Chetco Bar Fire 10 (2020), ECF No. 40-2 (hereinafter "GAO Report"). The forest has 340,000 acres of wilderness, including a 180,000acre area known as the Kalmiopsis Wilderness. *Id.* at 10. The forest had two large fires in the 30 years preceding the Chetco Bar Fire—the 1987 Silver Fire, which burned 100,000 acres and the 2002 Biscuit Fire which burned nearly 500,000 acres. *Id.* at 11–12.

On June 24, 2017, a lightning strike deep within the Kalmiopsis Wilderness ignited what became the Chetco Bar Fire. *See* Pls.' Ex. 1, Chetco Bar Long Term Analysis July 30, 2017, at 1, ECF No. 42-1 (hereinafter "July 30 LTA"). The fire burned undiscovered until July 12, 2017, when an airline pilot flying overhead spotted it. *See* Pls.' Ex. 5, 2017 Chetco Bar Fire Timeline at 1, ECF No. 42-5[3] (hereinafter "Timeline"). Within ninety minutes of its discovery, four USFS firefighters rappelled from a helicopter onto a ridge above the fire, beginning the government's response. *See* Timeline at 1; July 30 LTA at 1.

The fire, burning mid-slope on a ridge along the Chetco River, spanned one-half acre. Timeline at 1. The rappeler-firefighters attempted to clear a landing spot while three other helicopters dropped 17,280 gallons of water on the fire. *Id.* But the fire grew to ten acres overnight, fueled by dead trees left by the Biscuit Fire. *Id.* at 2. The next day, USFS dispatched four additional firefighters, an air tanker dropped 1,375 gallons of fire retardant, and helicopters dropped another 18,000 gallons of water on the fire. *Id.* at 2–3. However, the terrain was too steep for the firefighters to build effective containment lines, leaving them without escape routes or safety zones as the fire spread. *Id.*; July 30 LTA at 1. For the safety of the firefighters and the low probability of containment, the Forest Service ended its direct attack and adopted an indirect suppression strategy. *See* GAO Report at 17.

At that time, the fire was still isolated in the wilderness and the WFDSS assessed its behavior as "low-to-moderate." Timeline at 3. USFS transferred command of its fire response to a Type-3 incident management team ("IMT").[4] Pls.' Ex. 13, July 13, 2017 Wildland Fire Decision Support Software ("WFDSS") Report at 8, ECF No. 42-13 (hereinafter "July 13 WFDSS"); Timeline at 2–3. The IMT planned containment and contingency lines and teams installed remote automated weather stations ("RAWS") to monitor weather data near the fire. *Id.* at 4. The IMT's sought to protect USFS land, private property, including Emily Camp, Tolman Ranch, Packer's

[3] The 2017 Chetco Bar Fire Timeline is also defendant's exhibit 1. ECF No. 40-1. For clarity, the Court uses the document numbering from plaintiffs' version, ECF No. 42-5.

[4] Forest Service IMTs are classified by the complexity of the fire they manage; Type 5 teams manage the least complex fires and Type 1 teams handle the most complex fires. GAO Report at 14. The Forest Service has four Type 1 NIMO teams, which are deployed nationwide. *Id.*

Cabin, and high value timber by keeping the fire within the Kalmiopsis Wilderness. July 19 WFDSS at 10. The IMT intended to use "minimally invasive suppression tactics" within the Kalmiopsis Wilderness but planned to use both "direct and indirect tactics" if the fire spread outside. Pls.' Ex. 15, July 19, 2017 WFDSS 14, ECF No. 42-15 (hereinafter "July 19 WFDSS").

The IMT set management action points ("MAP"), anchor points and lines to contain the fire. *See generally* July 19 WFDSS. If the fire crossed a MAP, it would trigger a shift in tactics. *See id.* at 14–28. The IMT also considered backfire operations (also called burnouts or firing operations), in which firefighters light separate fires to burn toward the main fire to starve it of fuel, along the Tin Cup Ridge, Tin Cup Creek, and Chetco River. Timeline at 4. These proposals were ultimately rejected because there were no escape routes and the risk of the fire continuing across the Chetco River was too high. *Id.* By July 20, 2017, the fire engulfed 500 acres, still deep in the wilderness. *Id.* at 4–5. At the end of July, the fire grew by 100 acres per day, but it was still contained by the Chetco River to its south and west. Def.'s Ex. 24, USDA Forest Serv. & DOI Bureau of Land Mgmt., 2017 Pac. Nw. Fire Narrative 47, ECF No. 40-24 (hereinafter "2017 PNW Fire Narrative").

On July 29, 2017, a USFS National Incident Management Organization ("NIMO") team relieved the IMT and continued the IMT's July 19 WFDSS strategy. *Id.* The NIMO team had authority for a range of suppression and containment actions, including backfire operations. GAO Report at 14. During the next two weeks, the fire continued to spread to the north and northeast, growing to 5,438 acres. 2017 PNW Fire Narrative 47.

The NIMO Team conducted a long-term risk assessment, which used fire spread probability ("FSpro") analysis to predict there was low probability that the fire would spread south or southwest of the ignition point. Def.'s Ex. 4, Long Term Assessment & Implementation Plan (Aug. 11, 2017) 33–34, ECF No. 40-4 (hereinafter LTA&IP). As it relates to plaintiffs' properties, FSPro assessed a 0.2–4.9% chance that the fire would spread to Packer's Cabin within fourteen days and a 5–19% chance it would reach the cabin within 30 days. *Id.* The FSPro calculated a less than 0.2% chance the fire would reach the Chetco River Inn in 14 days and a 0.2–4.9% it would reach the inn within thirty days. *Id.* These percentages did not account for suppression actions. *Id.* at 33. However, the assessment warned that "significant weather events may produce conditions that exceed the ability to accurately predict the fire spread" and the results of the assessment should be considered "invalid if … conditions become unrepresentative (e.g., extensive periods of record-setting environmental conditions)." *Id.* Essentially, the fire spread probabilities calculated on August 11 were subject to changing conditions.

**B. Chetco Effect Winds**

On August 15, 2017, a local weather phenomenon, known as "Chetco effect" winds, pushed the fire south. 2017 PNW Fire Narrative 47. The winds occur when low pressure builds along the coast between North Bend, Oregon and Crescent City, California while high pressure builds in the interior of Oregon. Pl.'s Ex. 4, Werth Meteorology Report 6, ECF No. 42-4 (hereinafter "Werth

Report"). The pressure difference causes winds to move westerly from the Great Basin,[5] over the Cascade and Oregon Coast mountains toward the low pressure over the southern Oregon coast. Def.'s Ex. 3, Abatzoglou Meteorology Report 10, ECF No. 40-3 (hereinafter "Abatzoglou Report"). Like the well-known Santa Ana winds, the Chetco effect winds bring hot, dry air, which reverses the typically lower-temperature and higher-humidity coastal climate. *Id.*

Chetco effect winds can occur anytime during the year, but the strongest bouts typically occur two to four times during the late summer and early autumn, each of which last several days. *See id.* at 10–11; Werth Report at 6. Wind temperatures can rise forty degrees above the surrounding areas. and may cause explosive fire growth by both pushing the flames with hot air and desiccating fuels in the fire's path. 2017 PNW Fire Narrative at 47; Abatzoglou Report at 10. Fires driven by downslope winds like the Chetco effect are "well-understood by fire agencies" and "represent a key watch-out pattern in the region." Abatzoglou Report at 10.[6] The winds began immediately, pushing the fire south across the Chetco River, where it outpaced USFS's models for Chetco effect-driven spread. 2017 PNW Fire Narrative at 47.

### C. Firing Operations

Due to the Chetco effect winds, the fire rapidly burned south toward Packer's Cabin, seven miles from the ignition point. 2017 PNW Fire Narrative at 48; LTA&IP at 34. As the winds drove the fire out of the wilderness, USFS planned a ten-mile-long burnout along Forest Road (FS) 1917, but the fire burned through the line before it could be built. GAO Report at 28–29. Other large-scale backfires were cancelled because of the Chetco effect winds, which caused spot fires by blowing embers one to two miles ahead of the fire's main body. *Id.* at 29. By August 17 the fire threatened homes, buildings, and other private properties. Pl.'s Ex. 19, Chetco Bar Fire Daily Updates 15, Aug. 17, 2017, Evening Update, ECF No. 42-19. The NIMO team shifted strategy and allowed for tactical backfires to save individual properties. *Id.* As a result, USFS lit backfires around Packer's Cabin on August 18, then around the Chetco River Inn and the Wilderness Retreat on August 19 and 20, 2017. *See* Timeline at 6–9.

### D. Continued Growth and Defensive Actions

The Chetco effect winds abated on August 21, but the fire grew in those four days from 8,500 to 91,551 acres. GAO Report at 27. The governor of Oregon invoked the state's Emergency Conflagration Act, which authorized the state fire marshal to mobilize state resources to suppress and contain the fire. *See* Def.'s Ex. 18, Exec. Order No. 17-18, ECF No. 40-18. In the following month, 1,700 firefighters were assigned to the fire, more than one million gallons of water and

---

[5] The Great Basin is a "distinctive natural feature of western North America" that is "divided into rugged north–south-trending mountain blocks and broad intervening valleys" that covers an "arid expanse of about 190,000 square miles." *Great Basin*, Britannica.com, https://www.britannica.com/place/Great-Basin (last visited Aug. 12, 2026).

[6] During the coastal low-pressure event, if the pressure difference is three or more millibars higher in North Bend than in Crescent City, there is substantial risk for Chetco Effect winds. Werth Report at 6. The pressure difference was three millibars on August 16 and eight millibars by August 19. *Id.*

flame retardant were dropped on the fire, and crews lit several more backfires. GAO Report at 31–33; Third Suppl. Disc. Resp. at 4–5. The fire was not fully contained until November 2 after the weather shifted and the area received several inches of rain. GAO Report at 33.

In total, the Forest Service estimated the Chetco Bar Fire burned 191,197 acres of land, of which 170,321 belonged to the Forest Service, 6,746 acres belonged to BLM, and 14,130 acres of private property. *Id.*

### E. The Properties

Plaintiffs the Laursen family, the Brimm family, the Worlton family, and Chetco Resources LLC, and Pistol Resources, LLC all lost property in the fire.

Andrew and Shana Laursen, as trustees of the Laursen Family Trust, owned a recreational fishing cabin along the Chetco River (the "Laursen Property"). Pls.' Resp. at 12. The Laursen Property situates itself approximately four and a half miles southwest of Packer's Cabin. *Id.* The fire burned the fishing cabin and its contents. *Id.*

Byron Brimm owned a working ranch where he lived with his wife and raised cattle and timber (the "Brimm Property"). *Id.* The Brimm Property is located south of the Laursen property, approximately five miles from Packer's Cabin. *Id.*; Pls.' Ex. 10, Leavell Suppl. Report 13, ECF 42-10. The fire burned Brimm Property land, but no structures were lost. Pls.' Resp. at 12.

Cecilia and William Worlton owned a home approximately six miles southwest of Packer's Cabin (the "Worlton Property"). Pls.' Resp. at 12; Leavell Suppl. Report at 13. The Worlton Property was also used to raise livestock. *Id.* The Worlton residence and private property was burned in the fire, and only one barn and three trees remain. Pls.' Resp. at 12; Def.'s Ex. 19, Worlton Resp. to the United States' First Disc. Req. 3, ECF No. 40-19.

The Chetco Resources and Pistol Resources properties are owned by Chetco Resources, LLC and Pistol Resources, LLC, respectively. Pls.' Resp. at 12–13. The outer boundaries of these properties are two and half miles from Packer's Cabin at their closest point. *Id.* The properties were used to grow and harvest merchantable timber. *Id.* During the fire, "significant acreage" and a tree nursery burned on the Chetco Resources and Pistol Resources properties. *Id.*

### F. The Wildfire Management National Strategy

Starting in 2010, the United States Departments of the Interior and Agriculture developed a "cohesive wildfire management strategy" which outlined the departments' vision "[t]o safely and effectively extinguish fire, when needed; use fire where allowable; manage our natural resources, and as a Nation, live with wildland fire." *See* Def.'s Ex. 34, U.S. Dep't of the Interior & USDA, The National Strategy, The Final Phase in Development of the National Cohesive Wildland Fire Management Strategy 4, 10 (2014), ECF No. 40-34 (the "National Strategy). The National Strategy recognized that to achieve its goals, the nation must address "managing vegetation and

fuels; protecting homes, communities, and other values at risk; managing human-caused ignitions; and effectively and efficiently responding to wildfire." *Id.* at 10.

The Forest Service adopted these goals in its next five-year strategic vision. *See* Def.'s Ex. 35, USDA Forest Service Strategic Plan: FY 2015-2020 (2020), ECF No. 40-35 ("the Plan"). The Plan acknowledged the Forest Service's commitment to "work[ing] to control fires in a coordinated manner that is safe, efficient, and cost effective in order to retain healthy, resilient forests and grasslands while bolstering thriving communities" because "[w]ildland fire plays a natural and beneficial role in many forest types." *Id.* at 17.

## II. Procedural History

On October 21, 2022, Chetco Resources, LLC and Pistol Resources, LLC filed suit in this Court. *See Chetco Resources, LLC v. United States*, No. 22-1568, ECF No. 1. The Worlton, Brimm, and Laursen families brought suit the same day. *See Worlton v. United States*, No 22-1569, ECF No. 1. The cases were consolidated, and *Chetco Resources* was designated as the lead case. No. 22-1568, ECF No. 9. Defendant filed its answer on February 17, 2023. ECF No. 10. On March 26, 2026, defendant moved for summary judgment. ECF No. 40. Plaintiffs timely filed their response, and defendant filed its reply. *See* ECF Nos. 42, 44. The Court held oral argument in Washington, D.C. in June 2026 for the parties to expand on their positions in their briefing.

## III. Jurisdiction

The Court has jurisdiction under the Tucker Act over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages but does not by itself confer any substantive rights on a plaintiff. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983); *United States v. Testan*, 424 U.S. 392, 398 (1976). Plaintiffs must identify a separate source of law that can "fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Jan's Helicopters Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1306 (Fed. Cir. 2008) (quoting *Mitchell*, 463 U.S. at 216–17). The Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use without just compensation." U.S. Const. amend. V. Because the Takings Clause provides a substantive right to money damages, claims for compensation under the Clause are within the Court's Tucker Act jurisdiction. *Preseault v. Interstate Com. Comm'n*, 494 U.S. 1, 12 (1990).

## IV. Standard of Review

A court shall grant summary judgment where "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Rules of the United States Court of Federal Claims (RCFC) 56(a). *See also Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). A

fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute is genuine if it might be resolved in favor of either party. *Id.* at 250. The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). All the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). However, if "the evidence [of the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

The Takings Clause bars the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). If the "government 'physically acquires private property' for public use, then there is a physical taking to which a *per se* rule applies." *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 978 (Fed. Cir. 2023) (quoting *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021)). The Takings Clause "imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point*, 594 U.S. at 147–48 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321–22 (2002)). Put simply: "[t]he government must pay for what it takes." *Id.*

"A claimant under the Fifth Amendment must show that the United States, by some specific action, took a private property interest for a public use without just compensation." *All. of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994). A physical taking occurs when the government exercises eminent domain or when it takes physical possession of property without acquiring title to it. *Cedar Point*, 594 U.S. at 147–48 (citing *United States v. Pewee Coal Co.*, 341 U.S 114, 115–117 (1951)). Cases with no formal exercise of eminent domain are "inverse condemnation[s]." *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (quoting *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005)).

Inverse condemnation "is a 'shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *Moden*, 404 F.3d at 1342 (quoting *United States v. Clarke*, 445 U.S. 253, 257 (1980)). *Ridge Line, Inc. v. United States* set out the two-part test to distinguish an inverse condemnation from a tort: causation and appropriation. 346 F.3d 1346, 1355 (Fed. Cir. 2003). Inverse condemnation plaintiffs must show treatment under takings law is appropriate, that the government either intended to invade the property or the "asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the activity." *Moden*, 404 F.3d at 1342 (citing *Ridge Line*, 346 F.3d at 1355). Then, a plaintiff "must show that the invasion appropriated a benefit to the government at the expense of the property owner". *Id.* The appropriation must preempt the property owner's right to enjoy his property for an extended period, rather than merely by inflicting an injury which reduced the property's value. *Id.* (citing *Ridge Line*, 346 F.3d at 1356). Finally, a plaintiff must show "that it

possessed a protectable property interest in what it alleges the government has taken." *Ridge Line*, 346 F.3d at 1355.

Most takings claims "turn on situation-specific factual inquiries." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012). Thus, "due to the fact-intensive nature of takings cases, summary judgment should not be granted precipitously;" and proof of causation should generally be presented at trial. *Moden*, 404 F.3d at 1342 (citing *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983)).

## V. Discussion

Defendant moves for summary judgment because plaintiffs cannot establish causation under the proper "but-for" standard for any of their claims. Mot. Summ. J. at 22; Def.'s Reply at 7. Defendant further contends that plaintiffs cannot show the Forest Service managed the fire to achieve natural resource benefits.

Plaintiffs argue that the Forest Service's natural resource benefits policy led the government to manage the fire instead of extinguishing it, causing a small fire in the wilderness to burn into a conflagration. Then, plaintiffs argue that backfires set by the Forest Service and crews under its command caused their properties to burn. Plaintiffs argue that they can show a taking under the "but-for" standard. However, in plaintiffs' view, they can demonstrate causation under alternative standards because the causation standard used in inverse condemnation is derived from flood cases but is inappropriate for forest fires.

The Court first addresses the natural resources benefits claim, then addresses plaintiffs' claims on the backfiring operations. For the reasons set forth below, the Court **GRANTS-IN-PART** and **DEFERS-IN-PART** defendant's motion for summary judgment.

### A. Plaintiffs' Resource Benefit Management Theory

Plaintiffs argue that the government's management decisions during the Chetco Bar Fire were informed by natural resource benefit objectives rather than suppression tactics. *See* Pls.' Resp. at 43–48. Specifically, plaintiffs allege that the Forest Service used the Chetco Bar Fire to carry out the National Strategy by "using anticipated natural fire to alter landscapes in communities, on nonfederal public lands and on private real property," including plaintiffs' property. *See* Worlton Compl. at 5–6. The government contends that plaintiffs' resource benefit management theory is both "factually unsupported and legally unsound" because the fire started by lightning and government liability cannot arise from the failure to halt a natural fire. *See* Mot. Summ. J. at 27. In opposition, plaintiffs assert that witness testimony rejecting the resource benefit management theory conflicts with the contemporaneous wildfire management documentation, creating a factual dispute sufficient to survive summary judgment. *See* Pls.' Resp. at 43. For the reasons stated below, the Court grants summary judgment in favor of defendant on this issue.

**1. Plaintiffs' Resource Benefit Management Theory Fails as a Matter of Law.**

The thrust of plaintiffs' resource benefit management theory rests on the argument that the Forest Service took "no action to suppress the fire" in its early stages. *See* Pls.' Resp. at 43–45. Instead, plaintiffs assert that "something other than a suppression strategy was motivating the government's response to the fire." *See id.* at 45 (internal quotation marks omitted). Plaintiffs allege that the government employed a "let-burn" strategy in furtherance of its resource benefit objectives, and that while "[t]he wilderness was burning, [] the Forest Service was watching." *See id.* at 16, 18. *See also* Chetco Compl. ¶ 26 ("By July 29, 2017, WFU [wildland fire use] had restored the natural role of fire to 2,181 acres of the landscape."); Worlton Compl. ¶ 28 (same). In response, defendant submits that "[n]o government liability arises from the failure to suppress such a naturally occurring fire, regardless of the reason." *See* Mot. Summ. J. at 27–28. The Court agrees with defendant.

To succeed on a takings claim, a plaintiff must identify an affirmative act of the government to base its claim. *See St. Bernard Par. Gov't v. United States*, 887 F3.d 1354, 1360 (Fed. Cir. 2018). In other words, plaintiffs cannot assert a takings claim on alleged inaction or failure to act by the government. *See Johnson v. United States*, No. 22-584L, 2023 WL 1428603, at *5 (Fed. Cl. Jan. 31, 2023) (citing *St. Bernard*, 887 F3.d. at 1360).[7] Nor does nominal action suffice to establish takings liability. *See id.* at *7 (citing *Kinney v. United States*, 161 Fed. Cl. 644, 649 (2022); *Ivaldy v. United States*, 655 F. App'x 813, 815 (Fed. Cir. 2016) (holding that plaintiffs' reframing of the government's failure to suppress a fire was insufficient to meet the requisite showing of an affirmative government act)).

Considering "the real nature of the claim regardless of [the] plaintiff's characterization," the Court finds that the Forest Service's strategy on which plaintiffs base their claim constitutes inaction rather than action. *Wixson v. United States*, 173 Fed. Cl. 462, 466 (2024) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981)). In *Wixson*, a homeowner alleged a taking of his property from Forest Service-set backfires during a wildfire, and separately from cancelled firefighter training and cancelled preventative controlled burns during the Covid-19 pandemic. *Id.* at 464. Those cancellations "meant that the Forest Service did not do its ordinary maintenance of controlled burns and improperly set backfires on days with a high risk of wildfire growth." *Id.* The *Wixson* court considered previous cases addressing government failure or mismanagement and held that the government's cancellation of prescribed burns and firefighter training constituted inaction, not affirmative acts. *Id.* at 466 (collecting cases) ("[a] decision not to take an action—a choice not to conduct controlled burns or firefighter training—cannot give

[7] While negligence may give rise to a tort claim outside of this Court's jurisdiction, it is well settled that allegations of inaction cannot suffice to serve as the basis for a takings claim. *See St. Bernard*, 887 F3.d at 1360; 28 U.S.C. § 1491(a)(1).

rise to a takings claim"). The same is true here, and plaintiffs' resource benefit theory fails as a matter of law.

The Forest Service's apparent failure to suppress the fire, does not properly state an affirmative action on which a Fifth Amendment takings claim must be based. *See* Pls.' Resp. at 43–45; *Wixson*, 173 Fed. Cl. at 466 ("[F]ailure does not amount to government action"). Plaintiffs' attempt to reframe their allegations in affirmative terms does not cure this deficiency to their claim either. *Johnson*, 2023 WL 1428603, at *7. Plaintiffs assert "[t]he Forest Service Chief's own 'Elevator Speech' . . . included *a call to action*" and "[t]he *course of action* directed deployment of 'minimal resources' to 'monitor fire activity.'" *See* Pls.' Resp. at 14 (emphasis added). But even plaintiffs' own account reveals the flaw in their argument, "[t]he fact is, the government took no action to suppress the fire." Pls.' Resp. at 45. The "real nature" of plaintiffs' claim alleges no affirmative act, therefore, they allege no taking. *Wixson*, 173 Fed. Cl. at 466.

**2. Plaintiffs' Resource Benefit Management Theory Is Not Supported by the Record.**

Plaintiffs rely on select documents in the record that purport to "list resource management objectives, not suppression objectives" and "confirm the let-burn approach." *See* Pls.' Resp. at 43–45. On the contrary, the government argues that plaintiffs' "misinterpretation of select documents . . . has no evidentiary support and is directly contradicted by uncontested evidence." Mot. Summ. J. at 28. After careful review and consideration, the Court agrees with the government that the resource benefit management theory is not legally supported.

Summary judgment "should not be denied simply because the opposing party asserts that the movant's witnesses are not to be believed. However, summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses." *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158–59 (Fed. Cir. 2004). Plaintiffs cannot generate a material dispute of fact between testimony and documents based on a mischaracterization of the documents. *See infra* at n.8; *cf. George Fam. Tr. ex rel. George v. United States*, 97 Fed. Cl. 625, 629 (2011) (observing that "the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter." (citing *Anderson*, 477 U.S. at 255)). *See also Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993) (holding that "merely conclusory statements or completely insupportable, specious, or conflicting explanations or excuses will not suffice to raise a *genuine* issue of fact." (emphasis in original)).

Throughout their brief, plaintiffs cite to excerpts from documents in the record that, in isolation, seem to suggest that the Forest Service managed the Chetco Bar Fire to achieve certain resource benefit objectives. *See generally* Pls.' Resp. However, many of the documents quoted in plaintiffs' brief contain additional language not mentioned by plaintiffs that directly contradicts

their claims.[8] Some of plaintiffs' quoted references to the record have been altered without any indication; adding or deleting terms which change the meaning of the documents to support their position.[9] *Compare id.* at 45 ("[F]ire officers confirmed in a written report that 'the fire is currently meeting land management plan goals'"); *with* Timeline at 2 ("The fire is currently exhibiting low intensity behavior and is meeting land management plan goals"). Moreover, the Court does not accept the proposition that the absence of the word "suppression" in certain documents implies that the fire was not treated as a suppression fire. *See* Pls.' Resp. at 44.

The government argues that plaintiffs' resource benefit management theory is negated by deposition testimony. *See* Mot. Summ. J. at 28. The government contends "Every time we say it's a suppression fire, that automatically means we are not managing it for a resource benefit or use as a wildland fire or some of those other words that mean the same thing." Def. Ex. 26, Lanier Tr. 116:12–15, ECF No. 40-26. Plaintiffs contend that a conflict between documents in the record and the deposition testimony of the government's witnesses generates a material issue of fact. *See* Pls.' Resp. at 43. But there is no dispute between the documents and record, the government started suppressing the fire within ninety minutes of it being reported. *See* Timeline at 1. The Court is not persuaded by this manufactured conflict between plaintiffs' inconsistent account of the documents and the documents and record themselves. Put simply, because the documents proffered by plaintiffs do not suggest what plaintiffs claim, there is no conflict with the sworn deposition testimony. *See supra* at n.8.

Plaintiffs also argue that the Forest Service claimed plaintiffs' land as "an agency accomplishment toward national annual targets." Pls.' Resp. at 45–46. Specifically, plaintiffs claim that the government counted "15,243 acres of private land" toward its "unified hazardous fuels reduction target" in the Forest Activity Tracking System ("FACTS") database. As the government correctly identifies, plaintiffs "continue to rely on preliminary draft documents that were not subject to quality control," and which were subsequently corrected. *See* Reply at 21. While the preliminary FACTS document cited by plaintiffs disclaims that the data may be

---

[8] For instance, plaintiffs claim that "[t]he first WFDSS decision document, issued July 13, 2017, listed only two strategic objectives for the fire. Neither was suppression." Pls.' Resp. at 23. That same WFDSS document also listed "Incident Objectives" which instructed fire personnel to "weigh all potential *suppression* actions in consideration of the values at risk and the probability of success of firefighting actions." July 13 WFDSS at 11 (emphasis added).

[9] The Court does not look favorably upon plaintiffs' repeated mischaracterizations of the record, especially in light of the United States District Court for the District of Utah's admonishment of plaintiffs' counsel for the same conduct. *Compare Strawberry Water Users Ass'n v. United States*, No. 2:22-cv-00002-JNP-DAO, 2023 WL 2634333, at *8 (D. Utah Mar. 24, 2023) ("Neither the words '*regardless of ownership*,' nor their substance, are found anywhere in the National Plan. It seems SWUA pulled these extra words from thin air to alter the National Plan's meaning") (emphasis added), *with* Chetco Compl. ¶ 11 (Describing the National Plan as addressing "'objectives for long-term ecosystem health and resilience' of lands *regardless of ownership*") (emphasis added). The phrase "regardless of ownership" is still not in the National Plan.

"incomplete," the government clarified that the final version, completed in November 2018, "does not include Plaintiffs' acreage." *See id.* at 21–22.

That defendant may have claimed plaintiffs' acreage in its preliminary data ultimately does not matter. The Forest Service plan is clear that only Forest Service land counts toward their goals. *See* Def.'s Ex. 29, Skelly Tr. 145:126–18, ECF No. 40-29 ("Non-forest system lands cannot be counted in that assessment because they are not under the forest plan"). No other land, including other federally owned land, counts toward the Forest Service's goals. *Id.* Plaintiffs have no facts to rest this claim upon, they cannot take inaccurate preliminary data and extrapolate an *ex post facto* action-by-inaction to burn their properties.

### B. Plaintiffs' Firing Operations Claims

#### 1. The August 18, 19, and 20 Firing Operations

The parties dispute the causation standard for wildfires with backfiring operations. For reasons set forth below, the Court **DEFERS** ruling on defendant's motion for summary judgment for plaintiffs' claims related to the August 18–20 firing operations.

Plaintiffs claim that the government's backfiring operations caused their properties to burn by directly lighting fires on their land or from other backfires spreading onto their properties. *See* Chetco Compl. ¶¶ 47–71; Worlton Compl. ¶¶ 49–73; Pl.'s Resp. at 25–28.[10] Defendant argues that all of plaintiffs' claims should be dismissed because plaintiffs failed to show their property would not have burned but for the entire suppression efforts. Mot. Summ. J. at 23.

As is the standard in most inverse-condemnation cases, "a plaintiff must show that in the ordinary course of events, absent the government action, plaintiffs would not have suffered the injury." *St. Bernard*, 887 F.3d at 1362. Relying on this causation standard, defendant asserts this framework applies to all types of physical takings, including flooding, erosion, and fire. *Id.* (citing *Ideker Farms*, 71 F.4th at 981; *Applegate v. United States*, 35 Fed. Cl. 406, 417 (1996); *McDonough Fam. Land, LP v. United States* (*McDonough I*), 172 Fed. Cl. 414, 425 (2024)). Under this standard, plaintiffs "will have to show by preponderant evidence that—absent the firing operation and other suppression efforts undertaken by the government—their property would not have burned." Mot. Summ. J. at 24 (quoting *McDonough I*, 172 Fed. Cl. at 425) (emphasis omitted).

In response, plaintiffs contend: (1) that the but-for standard the government presents for inverse condemnation takings is actually an affirmative defense and the government must plead it as such, which plaintiffs frame as the "zero intervention" theory; (2) the backfires were "discrete physical acts," not part of an integrated government response to the Chetco Bar Fire; (3) the

[10] Plaintiffs also claim that the Forest Service lit backfires to restore the natural role of fire on the landscape in accordance with the National Strategy. Chetco Compl. ¶¶ 29–46; Worlton Compl. ¶¶ 31–48. Because plaintiffs allege affirmative acts, lighting the fires, the Court includes this claim in the backfiring operations, notwithstanding plaintiffs' framing of the Forest Service's motivation.

backfires are the "challenged government action" in a *per se* taking, in which causation is established by the act of taking itself; and (4) in cases where there are multiple causes, the substantial-factor test from tort law should apply. *See* Pls.' Resp. at 30–43.

In a related case, the plaintiffs asked that court to adopt the same causation framework(s) that the plaintiffs propose here. *See McDonough I*, 172 Fed. Cl. at 425. The *McDonough* court declined. *Id.* The plaintiffs survived summary judgment, but the court held them to the "but-for" standard at trial. *See id.* (citing *St. Bernard*, 887 F.3d at 1362). At trial, the plaintiffs failed to "show by preponderant evidence that absent the firing operations *and* other firefighting efforts undertaken by the government, beginning at the outbreak of the Alice Creek Fire — the damage to their property would have been less severe." *McDonough Fam. Land LP v. United States* (*McDonough II*), 178 Fed. Cl. 229, 238 (2025), *appeal docketed*, No. 26-1138 (Fed. Cir. Nov. 4, 2025) (emphasis in original).

Here, the parties contend the standard is determinative. *See* Mot. Summ. J. at 7, 26; Oral Arg. Tr. 18:21–23; Pls.' Resp at 30–31. The Court need not decide this today. Identical arguments presented here are pending before the United States Court of Appeals for the Federal Circuit. *See generally* Principal Brief of Plaintiffs-Appellants, *McDonough Fam. Land, LP v. United States*, No 26-1138 (Fed. Cir. Feb. 10, 2026), ECF No. 16. Defendant argues the same but-for causation standard as here. *See generally* Response Brief for the United States, *McDonough Fam. Land, LP v. United States*, No. 26-1138 (Fed. Cir. May 22, 2026), ECF No. 21. Briefing completed on July 2, 2026.

Therefore, the Court **DEFERS** ruling on plaintiffs' claims from the August 18–20 backfire operations around Packer's Cabin, the Chetco River Inn, and the Wilderness Retreat pending the decision of the Federal Circuit in *McDonough*.

#### 2. Firing Operations After August 2017

Defendant asks the Court to enter judgment for the firing operations after the peak of the Chetco effect. Mot. Summ. J. at 22. Plaintiffs conceded this point and therefore waived any damage from September 2017 firing operations. *See* Oral Arg. Tr. 39:14–22. Therefore, the Court **GRANTS** summary judgment on any inverse condemnation claims stemming from backfires lit between September and November 2017.

## VI. Conclusion

For the foregoing reasons, the Court **GRANTS-IN-PART** and **DEFERS-IN-PART** defendant's motion for summary judgment, ECF No. 40. The Court **ORDERS** the parties to meet and confer within seven days of the Federal Circuit's decision in *McDonough Family Land, LP v. United States*, No. 26-1138. Within the same timeframe, parties **SHALL** file a joint status report apprising the Court of their views on future proceedings. If the parties wish to move ahead on trial, the joint status report **SHALL** include a proposed schedule for pre-trial and trial deadlines and events. The parties may file supplemental briefs discussing the impact of the Federal Circuit's

ruling on the summary judgment briefing. Briefs will be limited to 10 pages and must be filed within 21 days of the ruling. The trial scheduled for December 2026, in Portland, Oregon, is **POSTPONED**.

**IT IS SO ORDERED.**

s/ Loren A. Smith

Loren A. Smith,
Senior Judge